(No. 13095.—Judgment affirmed.)

THE SPRINGFIELD COAL MINING COMPANY, Plaintiff in Error, *vs.* THE INDUSTRIAL COMMISSION *et al.*—(MARY WILEY, Admx. Defendant in Error.)

*Opinion filed February 18, 1920.*

1. WORKMEN'S COMPENSATION—*meaning of the words "salary," "wages" and "earnings," in section 10 of Compensation act.* The words "salary," "wages" and "earnings" in section 10 of the Compensation act are all used in referring to the money or other compensation to be paid the employee for his services rendered and are intended to cover any and all terms that various employers and employees might use to designate wages or earnings.

2. SAME—*what sums should not be deducted from miner's earnings before computing compensation.* Amounts which the employer customarily deducts from a miner's wages to pay for the powder, carbide, blacksmithing and other items used by the miner in his work, and to pay his union dues, fines and assessments, in accordance with an agreement with the miners' union, should not be deducted from the gross earnings of the miner in fixing a basis for compensation as provided by section 10 of the Compensation act, as such deductions are in the nature of payments by the miner to his employer and not sums "which the employer has been accustomed to pay the employee to cover any special expense entailed on him by the nature of his employment."

3. WORDS AND PHRASES—*definition of words "wage," "salary" and "earnings."* A "wage" is the payment for service rendered by artisans or laborers receiving a fixed sum per day, week or month or for a certain amount of work, and a "salary" is a periodical allowance made as compensation to a person for his official or professional services or for his regular work, while the word "earnings" is the broadest term of the three and means money or other compensation to which one has a claim for services rendered.

4. SAME—*word "earnings" ordinarily does not mean net earnings.* The word "earnings," in its general acceptation, does not mean net earnings unless qualified in some way.

WRIT OF ERROR to the Circuit Court of Sangamon county; the Hon. E. S. SMITH, Judge, presiding.

A. M. FITZGERALD, and HARLEIGH H. HARTMAN, for plaintiff in error.

A. W. KERR, and W. J. MACDONALD, for defendant in error.

Mr. JUSTICE DUNCAN delivered the opinion of the court:

On September 27, 1917, the Industrial Commission, on a hearing, found the average annual gross earnings of the deceased at the time of his death to have been $933.21, the average weekly gross earnings $17.96, the average annual net earnings $752.20 and the average weekly net earnings $14.46. The commission also found that there was deducted by plaintiff in error from the decedent's gross earnings, for powder, carbide, blacksmithing and other items used by the deceased in his work of mining, and for union dues, fines and assessments, the sum of $181.01. It further found that such amounts so deducted from his wages were not furnished to the deceased by plaintiff in error to cover any special expenses entailed on him by the nature of his employment, and that for the purpose of computing compensation under the act the gross earnings apply. The commission then entered its order that petitioner is entitled to have and receive from plaintiff in error the sum of $8.98 per week for a period of 387 weeks and $4.74 for one week, as provided in paragraph (a) of section 7 of the Compensation act as amended. The circuit court of Sangamon county reviewed the proceedings and order of the commission on writ of *certiorari* and on May 27, 1919, quashed the writ, confirmed the award and certified that the case is one proper to be reviewed by this court.

The facts are not in dispute and were stipulated. William Wiley, the deceased, was employed by plaintiff in error under a contract between the miners' organization and the employers' organization. The coal was mined by use of drilling machines and various tools and implements belonging to the miners. The coal was blasted by powder purchased by the miners from plaintiff in error at $1.75 per keg, but it was not paid for in advance by them but was

deducted from their wages on pay-days. The carbide, black-smithing and some other supplies furnished to the miners by plaintiff in error were also paid for by the miners by deductions from their wages on pay-days. The union dues, fines and assessments were likewise deducted from their wages on pay-days for the benefit of and paid to the miners' organization. The deceased was paid the stipulated price per ton for mining coal, $.617. The earnings of the decedent for each pay were figured by multiplying the number of tons mined and loaded by him by the price per ton, and the price paid to him each pay was such amount, less deductions made by plaintiff in error for the things above enumerated. The findings of the commission as to the gross and net annual earnings are in accord with the stipulated facts. Mary Wiley is the surviving widow of the deceased and also the administratrix of his estate.

The only question presented for consideration in this case is whether the gross earnings or the net earnings of the deceased should be used in computing the amount of compensation to be awarded.

The measure of the responsibility which the employer assumes is the compensation provided by the various sections of the Compensation act, as declared by section 11 of the act. The question in this case is to be determined by the provisions of paragraphs (*a*) and (*g*) of section 10 of the act and the first two lines of that section, providing as follows:

"Sec. 10. The basis for computing the compensation provided for in sections 7 and 8 of the act shall be as follows:

"(*a*) The compensation shall be computed on the basis of the annual earnings which the injured person received as salary, wages or earnings if in the employment of the same employer continuously during the year next preceding the injury. * * *

"(*g*) Earnings, for the purpose of this section, shall be based on the earnings for the number of hours commonly

regarded as a day's work for that employment, and shall exclude overtime earnings. The earnings shall not include any sum which the employer has been accustomed to pay the employee to cover any special expense entailed on him by the nature of his employment."

Paragraphs (c), (d), (e) and (f) of the same section make provisions for employees working under various other conditions and circumstances, and their compensation is also computed on the basis of their annual earnings arbitrarily fixed by those paragraphs. In paragraph (c) the annual earnings of the employees are the same as those of persons of the same class in the same employment and same location, etc. In paragraph (d) the annual earnings, if not otherwise determinable, are 300 times the average daily earnings. For employees mentioned in paragraph (e) the annual earnings are the average daily earnings multiplied by the actual number of days employed, such actual days to be not less than 200. For the employees mentioned in paragraph (f) "the yearly wage shall be reckoned according to the average annual earnings of adults of the same class in the same" employment, etc.

It will be noted that in paragraph (f) "yearly wage" is used as the equivalent of the words "annual earnings." The words "salary," "wages" and "earnings" are all used in referring to the money or other compensation to be paid the employee for his services rendered. The three terms were evidently used by the legislature to cover any and all terms that various employers and employees might use to designate their wages or earnings. The word "wage" is defined in the Standard Dictionary as payment for service rendered by artisans or laborers receiving a fixed sum per day, week or month or for a certain amount of work (piece work). The word "salary" is defined in the same work as a periodical allowance made as compensation to a person for his official or professional services or for his regular work. This apt and significant language is then used: "La-

bor is remunerated by wages and by salaries, wages being the remuneration of subordinates and salaries of officials." The word "earnings" is defined in the same work as money or other compensation to which one has a claim for services rendered; wages; desert; reward. The terms "wage" and "earning" are both commonly used in the plural. "Earnings," as commonly used, is the broadest term of the three, as it is a term that aptly applies to the pay received by both the laborer and the official or "boss," but as used in the statute it signifies no more than the word "wages" if applied to a laborer and no more than the word "salary" when applied to the boss or official. The word "earnings," in its general acceptation, does not mean net earnings unless qualified in some way. *Smith* v. *Bates Machine Co.* 182 Ill. 166.

After carefully examining the various provisions of section 10 we are satisfied that the lower court properly construed the statute under the evidence in this record. It is clear that the gross earnings of the deceased are the proper basis for fixing the compensation, unless the provisions of paragraph (*g*) require a different construction. We are of the opinion that that paragraph requires no reduction of the compensation allowed by the commission in this case on account of the various items deducted from his wages on pay-days by plaintiff in error. The dues, fines, etc., are not customarily or otherwise paid by the employer to the employee "to cover any special expense entailed on him by the nature of his employment." They are not paid to the employee at all by the employer or to the organization within the meaning of that paragraph. The employee, through his employer, pays them himself to his organization from his wages and his employer simply deducts them from his wages and turns them over to the organization as agent for the employee, hence there is no payment of such a sum by the employer to the employee "to cover any special expense entailed on him by the nature of his employ-

ment." The nature or character of his employment does not impose upon him any special expense for such dues, fines, etc. It is his obligation to his organization that imposes or entails such expense.

The carpenter is accustomed by his occupation to supply himself with a kit or box of tools to engage in his trade. He carries along with his tools a number of instruments for keeping his tools in condition, such as files, sawsets and oil with which to oil the same. He also carries with his outfit various instruments for measuring, squaring or rounding his work and chalk and chalk-lines to lay off or line his work. The expense for these various items is a special expense entailed on him by the nature of his employment or trade, but it is not customary for any employer to pay him any sum to cover such special expense. If a merchant should employ a carpenter to work on a building or structure at five dollars per day and a fire occurred and the carpenter lost all of his tools and had no money on hand with which to purchase other tools, the merchant could not by an agreement with the carpenter sell him all the tools he needed for the job with the understanding that the carpenter was to pay him for the tools out of his wages, and later, in case the carpenter was injured, be entitled to have his compensation based upon his net earnings after deducting the price paid to him by the carpenter for the tools. In such a case the furnishing of the tools to the carpenter by the merchant, to be paid for later by the carpenter out of his wages, could not be said at all to be payments to him to cover his special expense in his trade for tools. It would only amount to an advancement to him of wages to buy his tools, and his compensation, under the statute, in case of an injury, would be the same as if he had bought the tools from an outsider and had paid for them by money advanced on his wages.

The miners are required, in order to pursue their occupation or trade of mining coal, to equip themselves with

drilling machines, shovels, lamps, carbide, powder, fuse, squibs, picks, wedges and sledges, and a box in which to keep such tools and supplies. This is the custom where coal mining is conducted by the use of powder or other explosives. The miners are also required at their own expense to keep their tools, lamps and other implements in proper condition for work. They therefore require the services of blacksmiths. Under the agreement with the miners plaintiff in error was to furnish to its miners a portion of the articles above named, as already herein set forth, which were to be paid for by the miners on pay-days out of their earnings. Their expenses were not in this way lessened any more than they would have been had such articles been bought from outsiders. They receive so much a ton for mining coal. Their wages are not increased or decreased or in any way affected by the fact that they buy the various articles aforesaid from plaintiff in error instead of buying them from an outsider. We cannot understand how the making of a contract by the operator to sell or furnish any one or more of said articles, to be paid for out of the miners' wages, can have the effect to reduce their compensation under said paragraph when the same would not be the case if the miners bought the same articles from an outsider. If such were to be the holding the compensation would be varied according to the number of those articles contracted to be sold by the operator and perhaps sold to the miners at a profit. Suppose we add to this contract the further provision that the operator is to sell or furnish the miners all of the articles above named necessary for them to equip themselves with, and also the further provision that he is to sell to them the particular character of shoes and clothing required for their special trade or occupation of mining, all to be paid for out of the miners' wages on pay-days. Under plaintiff in error's contention we would then have to reduce the annual wages by the total cost of all said articles in case of an injury to a miner and base his compensation upon the

net annual earnings in order to ascertain his compensation under the Compensation act, although his actual wages or earnings are the same, or so much per ton, for all the coal mined by him during the year. Such a holding would lead to absurd results not intended by said paragraph. The correct rule to be applied in this case will be readily understood by noting that such payments as were made by plaintiff in error in this case to the miners' organization were really payments of the deceased himself to his organization through plaintiff in error as his agent, and the amounts deducted by plaintiff in error for the articles sold or furnished to the deceased were really payments by the miner to plaintiff in error, and none of them were sums "which the employer has been accustomed to pay the employee to cover any special expense entailed on him by the nature of his employment."

The holding under the British act of 1897, which is very similar to ours, is in accord with our holding. In *Houghton* v. *Sutton Heath and Lea Green Collieries Co.* 3 B. W. C. C. 173, it was held that where sixpence a week was deducted from a miner's wages to pay for the oil of his lamp, the court held the deduction to be a part of his earnings, saying: "His wages were subject to this deduction, but that did not make his earnings or wages any less. I cannot see how any lines could be drawn if the fact of the master making a workman buy all sorts of necessary things from him and deducting the price from the workman's wages could be taken into account in estimating the earnings of the workman." The same character of holding was made in the following cases: *Abram Coal Co.* v. *Southern,* 5 B. W. C. C. 125, where deductions were sought to be made from a miner's wages for articles supplied and other equipment expense; in *Shipp* v. *Frodingham Iron and Steel Co.* 6 B. W. C. C., where the cost of explosives was deducted but held to be a part of the earnings; in *McKee* v. *Stein & Co.* 3 B. W. C. C. 544, a case

very similar to the one now before us.  See, also, Chartres on Judicial Interpretations of Workmen's Compensation Laws, 377; Harper's Workmen's Compensation, 185-187, inclusive, where the author discusses "earnings" and "special expense" as used in paragraph (*g*) of section 10.

The judgment of the circuit court confirming the award of the Industrial Commission is affirmed.

*Judgment affirmed.*

---

(No. 12930.—Reversed and remanded.)
EDWARD H. HARRISON, Defendant in Error, *vs.* THE ROSE-HILL CEMETERY COMPANY, Plaintiff in Error.

*Opinion filed February 18, 1920.*